UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: ) | |
| ) | |
| RODNEY GEROL SHARP, ) | Bankruptcy Case No. 07-18392 EEB |
| PAULA JAYE SHARP ) | |
| ) | Chapter 13 |
| Debtors. ) | |
| _____ ) | |
| ) | |
| In re: ) | |
| ) | |
| BRANDON JAMES FINCH, ) | Bankruptcy Case No. 07-22775 EEB |
| HEATHER BRIE FINCH ) | |
| ) | Chapter 13 |
| Debtors. ) | |
| _____ ) | |
| ) | |
| In re: ) | |
| ) | |
| JOSHUA STEVEN NOYES ) | Bankruptcy Case No. 08-29156 EEB |
| KIMBERLEE ANN NOYES, ) | |
| ) | Chapter 13 |
| Debtors. ) | |

**ORDER**
_____

In each of these cases, the standing Chapter 13 trustee (the "Trustee") objects to plan confirmation on the grounds the proposed treatment of the student loan creditors unfairly discriminates among unsecured creditors in violation of 11 U.S.C. § 1322(b)(1). These plans propose to pay the student loan creditor both outside the plan and pro rata as a "class four" unsecured creditor. For the reasons set forth below, the Court concludes that, under the unique circumstances of these cases, the Debtors' plans do not unfairly discriminate and the Trustee's objections are therefore OVERRULED. The Court nevertheless DENIES confirmation of the plans proposed by Debtors Rodney and Paula Sharp and Brandon and Heather Finch because those plans violate 11 U.S.C. § 1325(b)(1)(B)'s requirement that projected disposable income be paid to nonpriority "unsecured creditors."

## I. FACTS

The relevant facts of these cases are not in dispute. Each of these Debtors have current monthly income that exceeds the median family income for a household of the same size in the

State of Colorado.  The Debtors in each case have proposed 60-month plans that include pro rata payments to all unsecured creditors, including student loan debt, "inside" the plan, plus an additional payment to a student loan creditor "outside" the plan.  The Trustee does not dispute the calculation of any of the Debtors' projected disposable income ("PDI") on Official Form 22C, nor does the Trustee dispute that each of the Debtors is applying all their PDI to make payments to unsecured creditors under their respective plans as required by 11 U.S.C. § 1325(b).[1]  In each case, however, the income and expenses on the Debtors' Schedules I and J reflect that each debtor has sufficient postpetition monthly income over and above their PDI to make additional payments on their student loan debt.  The Trustee argues that these discretionary payments, in combination with the pro rata payments student loan creditors would receive under each plan, violate the prohibition against unfair discrimination found in § 1322(b)(1).

**A. Debtors Noyes**

Debtors Joshua and Kimberlee Noyes list general unsecured claims totaling $100,511.13 on their Schedule F.  Included with the general unsecured creditors is one student loan with a balance of $36,697.65, which means the non-student loan general unsecured creditors' claims total $63,813.48.  Debtors' Form 22C lists a monthly disposable income of $722.20.  In their Plan, Debtors propose to pay $769 per month into the plan over sixty months, for a total of $46,140.  Of this amount, $37,542.00 will be paid to the nonpriority unsecured creditor class (referred to in these plans as the "Class Four" creditors), resulting in a 37% distribution.  The Noyes' plan includes their student loan debt among the participants in the Class Four distribution.  In addition, in Schedule J the Debtors indicate they will be making a $291.00 per month payment on the student loan.  Considering both student loan payments, the student loan creditor would receive an 85% distribution on its claim–37% through plan distributions and 48% through Debtors' monthly payments outside the plan.

The Trustee does not object to the payments made outside the plan to the student loan provider, but does object to the student loan debt also being included within the Class Four distributions.  The Trustee asserts this violates §1322(b)(1)'s prohibition against unfair discrimination toward a class or classes of unsecured claims.  The Trustee requests the plan be amended to exclude the student loan creditor from Class Four distributions but still allow the Debtors to make their proposed direct payments.  Under such plan, non-student loan general unsecured creditors would receive a distribution of 59%.  The student loan creditor would be paid 48% distribution. The Trustee notes that under this plan the student loan creditor is receiving the same payments it would receive had the Debtors not filed a Chapter 13 bankruptcy.

---

[1] These cases are subject to the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Unless otherwise noted, all references to "Section," §, or the "Code" shall refer to Title 11, United States Code, as amended by BAPCPA.

### B. Debtors Finch

Debtors Brandon and Heather Finch list general unsecured claims totaling $154,961.33 on their Schedule F. This amount includes one student loan with a balance of $24,636.63 and non-student loan general unsecured debt totaling $130,324.70. Debtors' Form 22C lists a monthly disposable income of $987.73. In their Plan, Debtors propose to pay $1,045 per month into the plan over sixty months, for a total of $62,700. Of this amount, $53,630.00 will be distributed to Class Four claims, resulting in a 35% distribution. The Finches' plan includes their student loan debt among the participants in their Class Four distribution. In addition, Debtors' Schedule J indicates they will be making a $223.00 per month payment on the student loan. Considering both student loan payments, the student loan creditor would receive an 89% dividend–35% through plan distributions and 54% through Debtors' monthly payments outside the plan.

Again, the Trustee does not object to the payments made outside the plan to the student loan provider, but does object to the student loan debt also being included within the Class 4 distributions. Under the Trustee's suggested plan, non-student-loan general unsecured claims would receive a dividend of 41%. The student loan creditor would be paid a 54% distribution and receive the same payments that it would receive if Debtors had not filed bankruptcy.

### C. Debtors Sharp

Debtors Rodney and Paula Sharp list general unsecured claims totaling $69,267.46 on their Schedule F, including one student loan with a balance of $10,148.37 and $59,119.09 in non-student loan general unsecured debt. Debtors' Form 22C lists a monthly disposable income of $279.62. In their Plan, Debtors propose to pay $279 per month into the plan over sixty months, for a total of $16,740. Of this amount, $12,792.00 will go to Class Four claims, resulting in an 18% distribution. The plan includes their student loan debt among the participants in the Class Four distribution. In Schedule J, the Debtors also indicate they will be making a $147.00 per month payment on the student loan. Considering both student loan payments, the student loan creditor would receive a 105% dividend–18% through plan distributions and 87% through Debtors' monthly payments outside the plan.

The Trustee requests that Debtors amend their plan to exclude the student loan creditor from participating in distributions to Class 4 creditors. Under the Trustee's suggested plan, non-student loan general unsecured claims would receive a distribution of 22%. The student loan creditor would be paid an 83% distribution and receive the same payments that it would receive if Debtors had not filed bankruptcy.

## II. DISCUSSION

### A. Section 1322(b)(1)

The Trustee objects to confirmation of the Debtors' plans on the ground that the plans "unfairly discriminate" between general unsecured creditors and student loan creditors in violation of § 1322(b)(1). Section 1322(b)(1) provides that:

> the plan may . . . designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not *discriminate unfairly* against any class so designated . . . .[2]

This section deals with two concepts: classification and discrimination.

A classification of claims "is simply the grouping together of claims with respect to which the plan proposes a common treatment."[3] Typically, a debtor wishing to classify certain unsecured debts into a class will explicitly describe the classification and propose a treatment for that class in the plan. However, classifications are not always explicit. Courts have recognized that a payment to a creditor "outside the plan" can amount to an implicit classification, even though not specifically referenced in the plan.[4] Thus, even though the Debtors' plans in these cases do not specifically provide for their student loan creditors to paid in a separate class, Debtors' payments to those creditors outside their plans could be considered a classification for purposes of § 1322(b)(1).

Discrimination means "simply to treat two classes differently on the basis of a difference between them."[5] By its plain terms, § 1322(b)(1) permits such separate classification and treatment of unsecured claims.[6] What is not permitted is "unfair" discrimination between classes of creditors. Unfortunately, the Code does not define when discrimination is "unfair." As a

---

[2] 11 U.S.C. § 1322(b)(1) (emphasis added).

[3] *In re Bentley*, 266 B.R. 229, 236 (1st Cir. BAP 2001).

[4] *See, e.g., In re Knight,* 370 B.R. 429, 433 (Bankr. N.D. Ga. 2007); *In re Pora*, 353 B.R. 247, 248-89 (Bankr. N.D. Cal. 2006).

[5] *In re Bentley*, 266 B.R. at 237.

[6] *See In re Labib-Kiyarash*, 271 B.R. 189, 192 (9th Cir. BAP 2001) ("By its own terms, § 1322(b)(1) allows for discriminatory treatment among classes of creditors, as long as that treatment is not unfair.").

result, courts have come up with various tests and factors to consider in applying § 1322(b)(1).[7] The most widely-applied test is called the "Lesser/Wolff" test, which determines fairness of proposed discrimination by looking at whether: (1) the discrimination has a reasonable basis; (2) the debtor can carry out a plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly related to the basis or rationale for the discrimination.[8] This test and other multi-factor tests used by other courts have been criticized as essentially a "'totality of the circumstances' or 'case-by-case' analysis, thereby running the risk of being depicted as an ad hoc, potentially purely subjective determination."[9] As such, the multi-factor tests have been rejected by some courts as providing no real direction for determining the fairness of discrimination.[10] Other courts have adopted a simpler test of judging unfair discrimination from the perspective of the discriminated creditors.[11] Only if the proposed classification provides some "correlative benefit" to the other unsecured creditors will the plan be confirmed.[12] Whatever test is applied, the burden of proof is on the Debtors to show that their proposed discrimination between the student loan creditor and other general unsecured creditors is not unfair.[13] This Court has wide discretion in making this determination.[14]

### B. Discrimination and Student Loan Debt

The issue of unfair discrimination has frequently been addressed in the context of plan payments made to student loan creditors, due to the somewhat unique status of student loan debt. In the normal Chapter 13 case, a debtor confirms a plan under which he or she makes payments over the plan period from PDI on his or her prepetition debts. Although certain specified priority claims must be paid in full over the life of the plan, plan payments usually do not pay the nonpriority, unsecured debt in full. A plan can be confirmed despite its failure to pay all nonpriority unsecured claims in full if "the plan provides that all of the debtor's projected disposable income . . . will be applied to make payments to unsecured creditors under the

---

[7] *See In re Orawsky*, 387 B.R. 128, 141-44 (Bankr. E.D. Pa. 2008) (describing various tests).

[8] The Lesser/Wolff test is based on the decisions in *In re Lesser*, 939 F.2d 669, 672 (8th Cir. 1991) and *In re Wolff*, 22 B.R. 510, 512 (9th Cir. BAP 1982).

[9] *In re Orawsky*, 387 B.R. at 141-42 (describing various criticisms).

[10] *In re Bentley*, 266 B.R. at 238.

[11] *See In re Brown*, 162 B.R. 506, 517-18 (N.D. Ill. 1993).

[12] *Id.*

[13] *In re Bentley*, 266 B.R. at 240.

[14] *In re Labib-Kiyarash*, 271 B.R. 189, 196 (9th Cir. BAP 2001).

plan."[15] So generally, at conclusion of the plan, there is a balance owing on the unsecured debts paid through the plan, and as to this balance "the court shall grant the debtor a discharge."[16]

Student loan debt, which is typically unsecured, is not granted priority under the Code and thus there is no requirement that it be paid in full during a plan. However, since 1990, student loan debt has been deemed nondischargeable in Chapter 13.[17] In addition, student loan debt claims accrue interest during the life of a Chapter 13 plan if the debtor does not maintain monthly payments.[18] "Thus, chapter 13 debtors have a compelling reason to seek, at minimum, to pay their student loan creditors whatever portion of disposable income is required to avoid the postpetition accrual of interest and/or penalties, lest the debtors emerge from bankruptcy owing significantly more on this nondischargeable debt than they did upon entering bankruptcy."[19] As a result, many debtors with student loan debt propose Chapter 13 plans that classify their unsecured debt such that payments go first to the nondischargeable student loan debt, to the extent necessary to keep it current, and leave only the remainder, usually a much smaller amount, for other dischargeable debt.

Courts considering whether plans "unfairly discriminate" when they allow full monthly payments on student loan debts have come to different conclusions.[20] Some cases allow a debtor to make regular payments to student loan creditors, even if that results in a substantially lower payment to general unsecured creditors.[21] This line of cases typically finds that discriminatory

---

[15] 11 U.S.C. § 1325(b)(1)(B).

[16] 11 U.S.C. § 1328(a). *See also In re Bentley*, 266 B.R. 229, 237 (1st Cir. BAP 2001) (describing process in the pre-BAPCPA context).

[17] In 1990, Congress passed the Student Loan Default Prevention Initiative Act of 1990, Pub. L. 101-508, §§ 3001, 3007, 104 Stat. 1388, 1388-25, 1388-28 (1990), which made certain government-sponsored educational loans nondischargeable in Chapter 13. Under BAPCPA, both government-sponsored and private student loans are nondischargeable in a Chapter 13 bankruptcy. *See* 11 U.S.C. §§ 1328(a)(2) and 523(a)(8).

[18] *See Leeper v. Pennsylvania Higher Educ. Assistance Agency*, 49 F.3d 98, 104 (3d Cir. 1995); *Gable v. Educ. Credit Mgmt. Corp. (In re Gable)*, 311 B.R. 904, 909 (Bankr. D. Kan. 2003).

[19] *In re Orawsky*, 387 B.R. at 144.

[20] *See* David M. Holliday, Annotation, *Chapter 13 Plan that Separately Classifies Student Loan Debt as Unfair Discriminatory Treatment of Class of Unsecured Claims Under § 1322(b)(1) of the Bankruptcy Code (11 U.S.C.A. § 1322(b)(1))*, 6 A.L.R. Fed.2d 507 (2005).

[21] *E.g., In re Truss*, 404 B.R. 329, 332-33 (Bankr. E.D. Wis. 2009); *In re Machado*, 378 B.R. 14, 17 (Bankr. D. Mass. 2007); *In re Chandler*, 210 B.R. 898, 904 (Bankr. D. N.H. 1997).

treatment is authorized by § 1322(b)(5), which provides that a plan may provide for the cure of a default and maintenance of payments while the case is pending "on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Given this provision, courts with this view hold that regular student loan payments, while possibly discriminatory to other unsecured creditors, are not unfair since the Code specifically allows for them.

On the other hand, many cases have ruled that Chapter 13 plans that propose to pay student loan claims at rates substantially higher than other unsecured debts unfairly discriminate and cannot be confirmed.[22] This is particularly true if the debtor offers no justification for the discrimination other than the nondischargeable nature of the student loan debt. These cases recognize that § 1322(b)(5) allows for (but does not require) a debtor to make maintenance payments on long term debt, but go on to conclude that such payments are still subject to unfair discrimination scrutiny under § 1322(b)(1). Courts often focus on the percentage of distribution the proposed plan will give on a student loan creditor's claim as compared to the pro rata percentage payment made on the pool of unsecured creditors. Where the difference in distribution rates is significant, the plan is frequently held unconfirmable. Although the Code does not require equal treatment of all unsecured creditors, many cases suggest that, to be confirmable, a plan should pay student loan creditors *pro rata* with other Class 4 unsecured creditors.

As noted by Debtors in these cases, many of the student loan cases addressing unfair discrimination are pre-BAPCPA cases. The passage of BAPCPA did not alter the language of § 1322(b)(1) or § 1322(b)(5), giving pre-BAPCPA cases continued relevance. Nevertheless, the Court agrees that BAPCPA impacts the analysis, at least in some cases, because BAPCPA altered the calculation of "projected disposable income" which an above-median income debtor must commit to a plan (assuming a creditor or the trustee objects) and added a requirement that a debtor pay his or her PDI to unsecured creditors.[23] PDI is essentially the "pot" that a debtor must distribute to unsecured creditors in a manner that does not unfairly discriminate.[24]

---

[22] *E.g., In re Kruse*, 406 B.R. 833, 839-40 (Bankr. D. Iowa 2009); In re Mason, 300 B.R. 379, 385-88 (Bankr. D. Kan. 2003); *In re Bentley*, 266 B.R. 229, 240-43 (1st Cir. BAP 2001).

[23] *See* 11 U.S.C. §§ 1325(b)(1) & (b)(1); *In re Williams*, 394 B.R. 550, 555-56 (Bankr. D. Colo. 2008).

[24] Most Chapter 13 plans are "pot" plans, or plans that provide that the debtor will pay a fixed amount or "pot" of money to the Chapter 13 trustee and the percentage that unsecured creditors receive ultimately depends on the total amount of claims filed and allowed. *In re Duggins*, 263 B.R. 233, 240 (Bankr. C.D. Ill. 2001). Pot plans can be compared to "percentage plans" under which "unsecured creditors will be paid a set percentage of their allowed claim, with the amount that the debtor pays determined by the amount of unsecured claims ultimately filed and allowed." *Id.* at 240 n.9.

Prior to BAPCPA, a debtor calculated PDI by a somewhat flexible formula. If a debtor accurately reported his income on Schedule I and if the expenses reported on Schedule J were all reasonably necessary, then the difference between Schedule I and Schedule J was the debtor's PDI. Whether an expense was "reasonably necessary" was a determination to be made by the bankruptcy judge. Within this context, debtors with student loan debt would sometimes list their monthly student loan payment on Schedule J as a "reasonably necessary" expense. Since the student loan payment was subtracted out of PDI, it thereby lowered the PDI available to be paid into the plan. In other words, debtors listed student loan debt payment on Schedule J in order to pay it "outside the plan" but the payment nevertheless affected the "pot" available to other unsecured creditors paid "inside the plan." Pre-BAPCPA cases considered such payments "outside the plan" to be a classification for purposes of § 1322(b)(1). If a court found such a classification to unfairly discriminate, a debtor was forced to pay all or some portion of the amount previously directed for the student loan payment into the "pot."[25] In essence, the debtor was precluded from subtracting the full amount of its student loan payment out of PDI by listing it on Schedule J. In this way, the unfair discrimination analysis and the PDI calculation were interrelated in some cases.

As has been widely discussed and criticized in the case law and elsewhere, BAPCPA significantly changed the PDI calculation. In BAPCPA, Congress redefined the term "disposable income" in § 1325(b)(2) as "current monthly income received by the debtor . . . less amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor . . . .". This amount is determined using a different methodology depending on whether the debtor's currently monthly income ("CMI") is above or below applicable median family income. Where a debtor has an above-median income, § 1325(b)(3) provides that "[a]mounts reasonably necessary to be expended . . . shall be determined in accordance with" § 707(b)(2)(A) and (B). Section 707(b)(2)(A) is a fairly complex mathematical test, often called the "Means Test," used to determine whether a presumption of abuse arises in Chapter 7 cases. Although an oversimplification, application of the Means Test in the Chapter 13 context can generally be described as subtracting from CMI certain monthly expenses and standard allowances. After taking the "Means Test" deductions and making certain other adjustments, an above-median debtor then arrives at a figure that is his or her monthly "disposable income" under § 1325(b)(2). This calculation is performed on a debtor's Form 22C.

This new calculation uses a "rigid and inflexible" set of expense standards, set forth in the Means Test, rather than the former, more flexible, judicially-governed standard.[26] The

---

[25] *See, e.g.*, *In re Hester*, 330 B.R. 809, 813 (Bankr. M.D. Fla. 2005); *In re Simmons*, 288 B.R. 737, 755-56 (Bankr. N.D. Tex. 2003); *In re Thibodeau,* 248 B.R. 699, 706 (Bankr. D. Mass. 2000).

[26] *See* 146 Cong. Rec. S11683-02, at S11703 (Dec. 7, 2000) (statement of Sen. Grassley) ("It is intended that there be a uniform, nationwide standard to determine disposable income

calculation of disposable income on Form 22C is the presumptive starting point for calculating PDI.[27] Deviation from that calculation is allowed upon a showing of special circumstances, but such a showing is difficult to establish.[28] Thus, in the normal case, the calculation of PDI will be made on Form 22C and the income and expenses listed on a debtor's Schedules I and J will not impact PDI. Because of this, a debtor's monthly "disposable income" on Form 22C is quite frequently different (and sometimes significantly different) from the monthly net income listed on Schedules I and J. Since it is based on historical income figures and standard expense deductions, PDI may not accurately reflect a debtor's present income and actual expenses.

The new PDI calculation can affect student loan debt in several ways. First, the flexibility to adjust PDI is now gone, absent a showing of special circumstances. A debtor cannot alter PDI by adding or subtracting a monthly student loan payment on Schedule J, and a debtor is required to pay PDI to his or her unsecured creditors. Second, the calculation of PDI on Form 22C does not explicitly account for a monthly student loan expense. A debtor could attempt to budget for a monthly student loan payment by including it as an "Other Necessary Expense" under § 707(b)(2)(A)(ii)(I) or argue for a special circumstance adjustment under § 707(b)(2)(B). But such attempts have had only limited success and none of the Debtors in these cases have attempted it.[29] In the typical case, this means the student loan payment must be paid out of PDI, unless a debtor has other funds available to pay it. In many cases, no such funds will exist and payment "outside the plan" will not be an option. However, because of the disconnect between the new PDI calculation and a debtor's actual income and expenses, there

---

used in chapter 13 cases, based upon means test calculations."); 145 Cong. Rec. H2718 (daily ed. May 5, 1999) (statement of Chairman Hyde); *see also* Statement of Administration Policy, Executive Office of the President (May 5, 1999), *available at* http://clinton2.nara.gov/OMB/legislative/sap/HR833-h.html ("H.R. 833 in its current form would limit access to Chapter 7 to debtors who meet an inflexible and arbitrary means test . . . . H.R. 833 simply takes IRS expense standards, which were not developed for bankruptcy purposes, and applies them rigidly to determine ability to repay in bankruptcy.").

[27] *In re Lanning*, 545 F.3d 1269, 1282 (10th Cir. 2008) (discussing calculation of the income side of the equation); *In re Williams,* 394 B.R. 550, 561-562 (Bankr. D. Colo. 2008).

[28] *In re Williams*, 394 B.R. at 561-65.

[29] *See In re Martellaro*, 404 B.R. 548, 560-62 (Bankr. D. Mont. 2008) (repayment of student loan debt not "special circumstance" or "other necessary expense"); *In re Knight*, 370 B.R. 429, 437-40 (Bankr. N.D. Ga. 2007) (student loan debt not "other necessary expense" but could be "special circumstance" if proven by debtor); *In re Vaccariello*, 375 B.R. 809, 816 (Bankr. N.D. Ohio 2007) (concluding in Chapter 7 case that repayment of student loan debt does not represent "special circumstance"); *In re Champagne*, 389 B.R. 191, 200 (Bankr. D. Kan. 2008) (concluding in Chapter 7 case that "It will be an unusual case where the circumstances of a student loan creates a financial condition which justifies the inclusion of this expense in the means test.").

9

will be cases in which a debtor's actual monthly income will exceed PDI, thus allowing a debtor to make payments (above PDI) to a student loan or other creditor. This extra income is sometimes referred to as "discretionary," indicating that a debtor is not required to pay it into the plan and has some discretion in how it is spent.

Such is the case for each of these Debtors. Each of the Debtors has sufficient actual income, after committing PDI to the plan, to make full monthly payments on their student loan debts. The payment to the student loan creditor does not lessen any of the Debtors' PDI payment. In fact, Debtor Finch and Debtors Noyes propose monthly plan payments *in excess* of their respective Form 22C disposable income, in addition to their monthly student loan payments. That these Debtors have excess income for student loan payments is a function of the historical PDI calculation imposed by BAPCPA, rather than any attempt to evade the payment of their PDI.

### C. Existence of Unfair Discrimination in these Cases

Given this context, the Court must determine if the Debtors' plans unfairly discriminate by making two types of payments to student loan creditors: (1) regular monthly payments outside the plan and (2) pro rata payments as Class 4 unsecured creditors. The Trustee does not contend that the first type of payments, those made outside the Debtors' plans with income above PDI, unfairly discriminate when considered in isolation of the pro rata payments. The Court agrees with this conclusion. Debtors' payments "outside the plan" are discretionary. The payments are not part of PDI and do not affect the PDI calculation. Moreover, the Trustee does not dispute any of the Debtors' calculation of PDI or that all of the Debtors' PDI is being paid into Debtors' plans. If Debtors did not pay the discretionary funds to student loan creditors, there is nothing in the Code that requires them to pay the funds into their plans or to Class 4 creditors specifically. Under these unique circumstances, the Court concludes that the discretionary payments to student loan creditors are not unfairly discriminatory, since Class 4 creditors are receiving all they are entitled to receive under § 1325(b).[30] To hold otherwise would subvert the disposable income test in § 1325(b) by requiring a debtor to pay more than PDI to unsecured creditors. The Court will not use the unfair discrimination test as a way around the new PDI calculation imposed by BAPCPA.[31]

Even though she concedes that payments outside the plan are not discriminatory, the Trustee argues that Debtors' additional pro rata payments to student loan creditors inside their plans unfairly discriminate. The Trustee contends that, since student loan creditors are receiving regular payments outside the plan, those creditors should not also receive a pro rata payment as a

---

[30] *See In re Orawsky*, 387 B.R. 128, 155-56 (Bankr. E.D. Pa. 2008).

[31] *Cf. In re Barr*, 341 B.R. 181, 185-86 (Bankr. M.D.N.C. 2006) (refusing to replace new disposable income calculation in § 1325(b) by analyzing income and expenses in under good faith analysis in § 1325(a)(3)); *In re Briscoe*, 374 B.R. 1, 21-23 (Bankr. D.D.C. 2007) (same).

Class 4 creditor. This argument has some appeal. If the student loan creditors are being paid their regular payments outside the plan, it seems somewhat excessive to make additional payments to them as members of Class 4. Moreover, as the Trustee points out, if you take the student loan creditors out of Class 4, other unsecured creditors will receive a higher percentage distribution, but will still receive significantly less than the student loan creditors.

As appealing as this argument sounds, this Court cannot conclude that Debtors' proposed pro rata payment of PDI to all unsecured creditors unfairly discriminates. Equality of distribution among unsecured creditors, absent an express grant of priority or cause for subordination, is a baseline principle of Chapter 13.[32] Debtors are proposing just that–equal distribution of their respective PDI among all unsecured creditors. There is no discrimination, and hence no unfair discrimination, between claimants holding dischargeable and nondischargeable unsecured claims. Pro rata, or proportionate distribution, by definition does not discriminate.

The Trustee argues that the pro rata payments should not be viewed in isolation but in combination with the payments made outside the plans. Even considering those payments, however, the Court finds no discrimination. The § 1322(b)(1) analysis in these cases cannot simply be a matter of adding up all payments received by student loan creditors and comparing the percentage repayment to the percentage received by other unsecured creditors. Rather, the payments must be viewed in the context of the disposable income requirement in § 1325(b). Debtors' student loan and non-student loan creditors are receiving exactly what the Code requires Debtors to pay them–a pro rata payment of PDI. The fact that the student loan creditors are also receiving a discretionary payment from Debtors does not entitle the remaining unsecured creditors to additional moneys, nor "dis-entitle" student loan creditors from receiving a pro rata payment. This interpretation of § 1322(b)(1) also allows the Court to read it harmoniously with § 1322(b)(5), which expressly contemplates the maintenance of payments on long term debts. The Court therefore overrules the Trustee's objections to Debtors' plan as violating § 1322(b)(1).

### D. Payment to Priority and Nonpriority Unsecured Creditors

As noted above, BAPCPA amended § 1325(b) to insert three new words, "to unsecured creditors." Specifically, the statute now mandates that a debtor's PDI, committed to be paid under a plan, is to be paid "to unsecured creditors." The statue does not specifically indicate whether "unsecured creditors" means priority unsecured creditors and/or nonpriority unsecured creditors. This Court has previously interpreted this phrase to require a debtor to pay PDI only to nonpriority unsecured creditors.[33] However, a debtor may account for payment of priority

---

[32] *In re Bentley*, 266 B.R. 229, 240 (1st Cir. BAP 2001).

[33] *In re Williams*, 394 B.R. 550, 562-66 (Bankr. D. Colo. 2008).

11

claims by deducting them in the PDI calculation, as permitted by § 707(b)(2)(A)(iv).[34]  This allows a debtor to use postpetition income to pay priority unsecured claims, but eliminates any double counting that would occur if a debtor also used PDI to pay those priority claims.[35]

Under this formula, a debtor calculates PDI according to Form 22C and then includes a further deduction granted by statute (but omitted from the form) that represents the amount of unpaid attorneys' fees and costs.  In addition, a debtor may adjust the deduction for trustee compensation on line 50b of From 22C to 10%, as required in this district.[36]  The resulting figure is then multiplied by the applicable commitment period.  This amount is the "pot" that must be paid to nonpriority unsecured creditors only.

The Sharps' plan does not apply this calculation.  The plan proposes to pay $12,792 to Class 4 creditors.  However, after adjusting the trustee's fee on Form 22C to 10% and deducting attorneys' fees and costs, the amount that has to be paid Class 4 is $13,824.60.  The Sharps are therefore $1,032.60 short in their payment to Class 4.

The Finches' plan is much closer but still slightly short.  Their plan proposes to pay $53,630 to Class 4.  After accounting for the 10% trustee fee and the attorneys' fees, the Finches should be paying $53,709.20 to Class 4.  Thus, their plan should be paying $79.20 more to Class 4.

The Noyes' plan is compliant.  After expense adjustments for attorneys' fees, the 10% trustee's fee, and deducting a priority tax payment included in the plan but not deducted on line 49 of Form 22C, the resulting required payment to Class 4 is $37,500.  The Noyes' proposed payment of $37,542 exceeds this amount.

### III.  CONCLUSION

For the foregoing reasons, the Court hereby:

A. Overrules the Trustee's objections to the Sharp, Finch and Noyes plans based on alleged unfair discrimination under § 1322(b)(1).  The Court holds that Debtors' plans to not unfairly discriminate.

B. *Sua sponte* holds that the Sharp and Finch plans violate § 1325(b)(1)(B)'s requirement that PDI be paid to "unsecured creditors," by offering to use the "pot" that is the product of PDI multiplied by the ACP to pay all priority claims,

---

[34] *Id.* at 563-64.

[35] *Id.* at 564 ("This Court agrees that the only sensible interpretation is one which allows the subtraction of priority claims for all debtors, 'once, no more, no less.'").

[36] *See In re Sharp*, Chapter 13 Case No. 07-18392 EEB (Bankr. D. Colo. Feb. 2, 2009).

and leaving only the balance to pay the nonpriority creditor class.  Instead Debtors must calculate PDI according to Form 22C, then include a further deduction granted by statute (but omitted from the form) that represents the amount of unpaid attorneys' fees and costs, and adjust the trustee fee deduction to 10%.  This amount is then multiplied by the applicable commitment period to arrive at the "pot" that must be paid to nonpriority unsecured creditors only.

D.  The Court DENIES confirmation of the Sharp and Finch plans in their present form.

F.  The Court CONFIRMS the Noyes plan.  A separate Order of Confirmation will issue in that case in due course.

DATED this 23rd day of September, 2009.

BY THE COURT:

Elizabeth E. Brown
United States Bankruptcy Judge